UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| United States of America | Criminal No. 3:09cr231 (JBA) |
| v. | |
| Richard Rowell | September 7, 2010 |

RULING ON MOTIONS FOR DNA TESTING [Doc. ## 95, 115], MOTION FOR ACQUITTAL [Doc. # 104], MOTION FOR NEW TRIAL [Doc. # 105], MOTION TO INCUR EXPENSES FOR DNA EXPERT [Doc. # 114], and
MOTION TO RELIEVE COUNSEL [Doc. # 113]

On April 29, 2010, a jury convicted Richard Rowell on Count One of the Indictment, charging him with possession with intent to distribute and distribution of 50 grams or more of cocaine base/crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(iii). Rowell now moves for a judgment of acquittal, claiming that evidence at trial was insufficient to convict him. He moves for a new trial both because of the claimed insufficiency of evidence presented against him at trial and because Juror # 38 was a police officer. He also moves for DNA testing of the crack cocaine and plastic bag obtained by law enforcement on or about April 10, 2009, arguing that the absence of his DNA on those items would be exculpatory evidence and should be provided to him as *Brady* material. Finally, Rowell moves *pro se* to relieve Attorney Richard Marquette as his counsel due to ineffective assistance of counsel and a "breakdown in communication[s]" with counsel.

I.  Trial Evidence

At trial, the Government's cooperating witness, Darrel Geyer, testified that he and another cooperator, Andre Watts, arranged with Rowell to have Rowell convert, or "cook" cocaine power into crack cocaine for them and demonstrate his methods to them. (Apr. 27, 2010 Trial Tr. [Doc. # 97] at 235:5–13.) Geyer, Watts, and Rowell planned to meet on April

10, 2009. At approximately 6:20 p.m. that evening, Geyer placed a telephone call to Rowell, recorded by law enforcement officers, in which Rowell asked Geyer "you still want me to spin the shit, right?" (Gov't Ex. 5B.) Law enforcement officers, under the direction of Rossin Marchetti, a Special Agent in the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), prepared $2,500 for the cooperators to pay Rowell for the controlled purchase of cocaine, and Special Agent Prather equipped Watts with covert equipment that recorded both video and audio, concealed in a backpack. (Apr. 26, 2010 Trial Tr. [Doc. # 96] at 87:20–88:2.) According to Marchetti, Geyer and Watts arrived at 20 Grove Street under law–enforcement surveillance and remained inside the residence for about an hour and a half. (*Id.* at 96:8–6.)

There, Watts used the recording equipment provided by Prather to record their interactions and activities with Rowell. Geyer testified at trial that shortly after he and Watts arrived, Rowell showed Geyer some crack cocaine, which Geyer recognized from selling drugs. Rowell said it was the "last bit of crumbs," which Geyer testified meant "the little bit of crack he had left from spinning some up." Geyer testified that Rowell then received a phone call informing him his cocaine supplier was outside the apartment. (*Id.* at 260:21–261:8.) The audio of the video recording corroborated that Rowell received a phone call. Geyer testified that Rowell then asked Watts to provide him with money, and Watts handed Rowell $2,000 of the money provided by the ATF. (*Id.* at 261:9–19.) According to Geyer's testimony, Rowell went outside and returned after five minutes and put a quantity of cocaine on a scale on the coffee table. (*Id.* at 261:20–262:7.) The video presented to the jury at trial showed Rowell pointing at the scale, and Geyer said that Rowell was pointing at the cocaine he just purchased. (*Id.* at 262:18–263:5.)

Geyer testified that the three men then went to the kitchen of 20 Grove Street, where they watched Rowell go through the cocaine–powder cooking process, including breaking up a compressed brick of cocaine powder (*id.* at 263:14–25), putting cocaine powder into a Pyrex container, adding water and baking soda, microwaving the substance, "whipping" it with a fork, blowing into it, adding more baking soda, and microwaving it again (*id.* at 265:6–16). The recording presented to the jury captured the audio of this processing, including Rowell's comment that the quality was strong and that he liked to deal with the individual who just sold him the cocaine because "the cane is always good." (*Id.* at 264:3–10.) Geyer testified that as Rowell made the crack, Rowell provided "the whole layout how to do it." (*Id.* at 265:22–24.) At one point, as Rowell blew into the mixture, he was recorded on the tape saying "that shit just blew up in my face." (*Id.* at 266:22–267:4.) Watts testified that Rowell commented "shit sounds like it's hard to me," and scraped the mixture into a plastic bag. (*Id.* at 371:10–13; 370:20–373:1.) Watts then paid Rowell the remaining $500 provided by the ATF, because Rowell "cooked [the powder cocaine]" for him. (*Id.* at 373:2–12.) Rowell remarked on the video soundtrack that the resulting amount of crack was "definitely more than 50." (Gov't Trial Ex. 10N.) Geyer testified that the plastic bag containing the crack cocaine was then put into the backpack. (*Id.* at 268:9–11.)

After Watts and Geyer left 20 Grove Street, ATF agents took the plastic bag containing the crack cocaine that had been in Watts' backpack. A DEA forensic chemist testified at trial to having tested it, determining that it was cocaine base and weighed 95.8 grams. (Apr. 27, 2010 Trial Tr. at 313:6–315:3.)

II.     Motion for Judgment of Acquittal

Defendant moves under Federal Rule of Criminal Procedure 29(c)(2) for judgment of acquittal, arguing that the Government presented insufficient evidence for the jury to have reasonably convicted him of possession with intent to distribute 50 or more grams of cocaine base. "A Rule 29 motion should be granted only if the district court concludes there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Irving*, 452 F.3d 110, 117 (2d Cir. 2006) (internal quotations omitted). The Court must view the evidence presented at trial in the light most favorable to the Government, and draw all reasonable inferences in its favor. *United States v. Cote*, 544 F.3d 88, 98 (2d Cir. 2008). "[I]t is well settled that 'Rule 29(c) does not provide the trial court with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.* at 99 (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)). "The Court must give full play to the right of the jury to determine credibility." *Cote*, 544 F.3d at 99. Further, Courts may "not attempt to second–guess a jury's credibility determination on a sufficiency challenge." *United States v. Florez*, 447 F.3d 145, 156 (2d Cir. 2006). A conviction "may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'" *Id.* at 155.

Rowell first argues that there is insufficient evidence that he knowingly possessed the crack cocaine in question, because there was no evidence that his fingerprints or DNA was on the on the narcotics or bag. He also notes that the Government's video exhibit does not show him touching the narcotics at any point. Despite the absence of DNA or fingerprint

4

evidence linking Rowell to the crack cocaine, there was the testimony of both Geyer and Watts about Rowell's receipt and extensive handling of the cocaine base during its processing into crack, which readily supports the jury's reasonable determination that Rowell knowingly possessed crack cocaine. Additionally, Rowell's argument that there was insufficient evidence without DNA or fingerprint evidence, fails because "the police do not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 58–59 (1988). Given that two eyewitnesses testified about circumstances clearly showing Rowell's knowing possession, which was corroborated by the audio of Rowell describing his method of "spinning" the cocaine powder into cocaine base, there was ample evidence for the jury to determine that Rowell knowingly possessed the narcotics in question, even in the absence of DNA or fingerprint evidence.

Next, Rowell argues that because of "inconsistencies"[1] in the testimony of the Government's witnesses, the jury could not have reasonably concluded that he intended to distribute any crack cocaine that he did possess. However, none of the inconsistences Rowell cites bear on his intent, or lack thereof, to distribute narcotics. Geyer and Watts both

---

[1] The "inconsistencies" Rowell identifies in his motion are (1) Marchetti tesified that Watts was not "working towards any consideration with pending state or federal case," while Watts testified that he did have pending charges; (2) Marchetti testified that the recording device used by Watts and Geyer on April 10, 2009 "turned off as the two confidential informants were departing the residence," while Special Agent Dan Prather testified that when he took the video camera out of backpack after the confidential informants left 20 Grove Street, the camera was still running; (3) Watts testified that he paid Rowell $500 after Rowell cooked the cocaine powder, which was not corroborated on the DVD; (4) Marchetti testified that the ATF cannot pay a confidential informant more than $100 per day, while Watts testified that for controlled purchases in the past, he was paid "like from 100 to like 150"; and (5) Geyer testified that Watts asked him if Rowell could cook cocaine powder, although Watts never testified that it was Watts's idea.

testified about circumstances manifesting Rowell's intent to sell them crack cocaine, and the jury could have reasonably concluded that Rowell had such an intent. As to any "inconsistencies," it was the jury's role, and not the Court's, to assess the credibility of the respective witnesses, and Defendant's motion for judgment of acquittal is denied.

III.    Motion for New Trial

Defendant moves for a new trial on the basis of his perception of evidentiary insufficiencies discussed above and because Juror # 38 was a police officer. Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." A Rule 33 motion should be granted only "in 'the most extraordinary circumstances,'" and must be denied unless there is "'a real concern that an innocent person may have been convicted.'" *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).

Since the Court has concluded that the evidence introduced at trial was sufficient to support the jury's conviction of Rowell for the earlier–discussed reasons, there is no real concern that an innocent person may have been convicted. Insofar as Rowell seeks a new trial based on his belief that Juror # 38 was biased because he was previously a police officer, Rowell's counsel had the opportunity to, but did not challenge him for cause or strike him during jury selection. "Failure to object to the composition of the jury has long been held to result in a waiver of the right of the accused to be heard by an impartial jury." *United States v. Lowe*, 96 F. App'x 23, 27 (2d Cir. 2004) (quoting *United States v. Ragland*, 375 F.2d 471, 475 (2d Cir. 1967)).

Rowell's concerns that Juror # 38 was biased stem from "his prior occupation as a police officer," which alone, of course, does not disqualify him,[2] and that juror's comment during jury selection that "[if] I was the defendant I don't think I would want me on the case. . . . Maybe because I still hold some preconceived notions about police officers' testimony." (Jury Selection Tr. [Doc. # 120] at 114:15–19.) However, when the Court further inquired "So, are you telling me that you think that you would give the law enforcement witnesses, the police witnesses, a little more credibility or weight than you would a layperson simply because they were a police officer?", Juror # 38 clarified that "I'm not saying that, your Honor. I think that the defense might think that I might," and he stated that he was in fact capable of "mak[ing] a fair observation" and would assess credibility of witnesses fairly. (*Id.* at 114:10–115:21.)[3] To establish juror bias, the challenger must show "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)); *see also Ragland*, 375 F.2d at 475 (the "burden of proving [juror] prejudice rests with the challenger," (citing *Irvin v. Dowd*, 366 U.S. 717, 723 (1961))). Given that Juror # 38 explained that while a criminal defendant might believe him to be biased because of his law–enforcement background, he was not in fact so biased and would weigh evidence fairly, Rowell has not demonstrated the existence of any

---

[2] "The mere fact of membership on a police force is not presumptively a disqualification for service on a jury in a criminal trial." *Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1980).

[3] The Court: "And making a fair observation means that you are not —your thumb isn't on the scale in some way with respect to what your assessment of the weight of the evidence is or the credibility of the witnesses?" Juror: "I don't think so." The Court: "You think you can do that fairly?" Juror: "Yes, ma'am."

circumstances that might demonstrate juror bias, and his speculation about bias is insufficient to warrant a new trial.[4]

During the hearing on his motions, Rowell himself supplemented his motion for a new trial. He claimed that ATF Special Agent Marchetti misled the Grand Jurors when he told them on October 21, 2009 that neither Watts nor Geyer still had pending cases in any court (*see* Hrg. Tr. [Doc. # 119] at 28:11–31:21), when in fact, the informant agreement entered into by Watts stated that he did have pending cases as of that date. Rowell and his counsel had the relevant grand jury transcripts and informant agreement before trial and could have questioned either Watts or Marchetti about this inconsistency at trial and chose not to do so. Instead, at trial, Rowell's counsel emphasized Watts' pending cases repeatedly at trial, in an attempt to discredit Watts' credibility, getting him to admit on cross–examination that he currently had pending cases. (Apr. 27 Trial Tr. At 380:6–12.) Marquette then asked Watts if he was "currently detained by the State officials," to which Watts responded "yes." (*Id.* at 380:13–15.) Marquette then asked Watts if he was "[h]oping your cooperation in this case will help you get out," to which Watts said "No." (*Id.* at 380:18–20.) Marquette also questioned Watts about the number of times he cooperated with

---

[4] The Supreme Court "has long held that the [post–trial] remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006) (quoting *Smith v. Phillips*, 455 U.S. 209, 215 (1982)). However, "probing jurors for 'potential instances of bias, misconduct or extraneous influences' after they have reached a verdict is justified 'only when reasonable grounds for investigation exist, in other words, where there is 'clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial.'" *United States v. Stewart*, 433 F.3d 273, 302–02 (2d Cir. 2006) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)). Since Rowell offers no such evidence about Juror # 38, no hearing is warranted.

federal investigators and how much he was paid. During his closing argument, Marquette argued that Watts was "simply not believable," because he and Geyer are "each self–motivated, self–centered people who are out to do what they need to do to get the better end of the stick at anybody's expense." (Apr. 28 Trial Tr. [Doc. # 98] at 17:10–14.) Marquette then stated "Mr. Watts has pending cases now. That will be a motivation on his behalf to fabricate." (*Id.* at 17:20–21.) Given Defendant's awareness of Marchetti's Grand Jury misstatement before trial, defense counsel's cross–examination and closing argument urging that Watts was motivated to lie because of his pending cases, along with the sufficiency of the trial evidence, Marchetti's misstatement to the Grand Jury and Marquette's failure to impeach him on it do not constitute "extraordinary circumstances," necessitating a new trial.

III.    Motion for DNA Testing

Defendant also moves for DNA testing of the crack cocaine and plastic baggy obtained by the DEA on April 10, 2009, and for funding to conduct that testing, arguing that the absence of DNA evidence is exculpatory and should have been provided as *Brady* material. 18 U.S.C. § 3600(a)(6)(B) provides that "[u]pon a written motion by an individual under a sentence of imprisonment . . . pursuant to a conviction for a Federal offense. . ., the court that entered the judgment of conviction shall order DNA testing of specific evidence if . . . [t]he applicant identifies a theory of defense that—would establish the actual innocence of the applicant of the Federal or State offense referenced." Because DNA testing is not the only way to demonstrate possession, and the jury had other evidence presented at trial on which to find that Rowell knowingly possessed the crack cocaine, the absence of Defendant's DNA on the drugs and bag would not establish Defendant's innocence under any theory of

defense. Therefore, DNA testing will not be ordered, and Rowell's motions for testing and funding are denied.

IV.     Motion to Relieve Counsel[5]

Rowell moves *pro se* to relieve Marquette from his appointment as defense counsel and seeks substitution of another lawyer for him. In his motion, Rowell stated that he has had "several disagreements, verbal [arguments] with counsel" and that Marquette provided ineffective assistance. (Mot. Relieve Counsel at 1.)

  A.     Breakdown in Communications

Rowell maintains that he has experienced a complete breakdown in communication with Marquette necessitating substitute counsel. In a letter to the Court dated July 12, 2010, Rowell asserted that Marquette does not accept collect calls, has not allowed Rowell to keep evidence, provided Rowell with a wrinkled shirt for jury selection, made racist comments, and referred to Rowell's family as uneducated. Rowell also explained at the hearing that Marquette made him attend a reverse proffer session in January 2010, despite Rowell's declaration that he did not "have anything to say to the police, [and] was not cooperating with them." (Hrg. Tr. at 10:6–9.) At the hearing on Defendant's motion to relieve counsel, Marquette established his belief that he has "done an absolutely yeoman job for Mr. Rowell," "met with him at Wyatt [Detention Facility] 12 times," and "showed Mr. Rowell every single stitch of evidence I had." (*Id.* at 39:7–10.) Although Rowell "was very insistent on having copies and originals of everything," Marquette explained to him that "that's not part of the

---

[5] Although Rowell listed as one basis for his motion "[c]onflict of interest," and expressed such concerns in letter dated June 11, 2010, he confirmed at the hearing that he was satisfied no conflict of interest exists. (*See* Hrg. Tr. [Doc. # 119] at 11:12–15 (The Court: "And you are satisfied that there is no conflict, as I am?" Defendant: "Yes, ma'am.").)

[District of Connecticut] standing orders, we can't do that," and thus Marquette "made it [his] business to go up multiple occasions and show him everything over and over again." (*Id.* at 39:12–17.)

The Sixth Amendment does not "guarantee 'a meaningful relationship' between the defendant and his counsel." *United States v. John Doe No. 1*, 272 F.3d 116, 122 (2d Cir. 2001) (affirming District Court refusal to appoint new counsel, even though there was an acrimonious relationship between the counsel and defendant, including threatening behavior by the defendant, where District Court conducted inquiry finding that there was some cooperation between defendant and counsel and where the defendant was largely responsible for any difficulty in the relationship) (citing *Morris v. Slappy*, 461 U.S. 1, 13–14 (1983) ("[N]o court could possibly guarantee that a defendant will develop . . . rapport with his attorney—privately retained or provided by the public.")).

In the Second Circuit, factors to be considered in deciding whether to relieve counsel or appoint new counsel include "whether the conflict between the defendant and his attorney was so great that it resulted in a total lack of communication preventing an adequate defense" and "whether the defendant substantially and unjustifiably contributed to the breakdown in communications." *John Doe No. 1*, 272 F.3d at 122–23. When counsel carries out his or her professional duties, files appropriate motions, cross-examines witnesses, and meets with the defendant, the existing strife between them is likely not so great as constitute to a "total lack of communication" preventing an adequate defense. *Id*; *see also United States v. Carreto*, 583 F.3d 152, 158–59 (2d Cir. 2009) (substitution of counsel unwarranted where the defendant's lawyer met with the defendant seven times, for approximately an hour each time and provided him with discovery materials).

Even if the relationship between Rowell and Marquette is personally unpleasant, Marquette nonetheless appears to have fulfilled his responsibilities as Rowell's lawyer. As in *Carreto*, Marquette has met with Rowell to discuss his case, presented Rowell with all the discovery in his possession, even if he was not permitted to leave it with Rowell. Before, during, and after trial Marquette has filed motions seeking relief on his client's behalf, most recently Defendant's motions for DNA testing, for a judgment of acquittal, for a new trial, and for a downward departure in sentencing. During trial, Marquette actively cross–examined Government witnesses. As to the January 2010 reverse–proffer session, attending such a session neither implies nor requires any cooperation commitment or any obligation to speak with federal agents or prosecutors; its purpose is for the Government to present its incriminating evidence to the defendant so that he may make his trial–or–plea decisions on an informed basis. Additionally, to the extent that there has been a breakdown in communications, it appears that Rowell has contributed to it. Marquette and Rowell both explained during the hearing that Rowell has additional information he wanted to include in various motions[6] that he refused to share with Marquette, which Marquette said is "hindering [his] prosecution of these motions." (Hrg. Tr. at 3:17–23.) Because Marquette has carried out his defense duties, because some of Rowell's mistrust was based on his mistaken belief that Marquette had a conflict of interest which has now been resolved (*see* n.4, *supra*), and because Rowell has contributed in part to the poor relationship, the deficits in communications do not warrant substituting counsel.

---

[6] In the August 10, 2010 hearing, Defendant laid out these additional bases for his post–trial motion, which are addressed above.

B. Ineffective assistance of counsel[7]

Rowell also seeks to substitute new counsel for Mr. Marquette, because he claims Marquette ineffectively represented him. Rowell orally described his grounds: (1) Marquette's failure to object to Juror # 38 despite Rowell's concerns about that juror, based on Juror # 38's statement during jury selection that "if I was the defendant I don't think I would want me on the case" because he had been a police officer (Jury Selection Tr. at 114:15–19); (2) Marquette's failure to impeach Marchetti during cross–examination about his untrue statement to the Grand Jury that Watts had no pending cases; (3) Marquette's letter to Rowell dated June 10, 2010 in which Marquette wrote that he met with "Attorneys Kaplan and Karwan as well as the DEA Agents" for a "reverse proffer session," when it was the ATF that investigated Rowell; (4) Defendant personally requested waiver of rights accorded under the Speedy Trial Act in a letter dated January 14, 2010; (5) Marquette was reluctant to move for DNA testing; (6) and if he had seen the whole video presented by the Government more than two days "prior to going to trial. . . . [m]aybe [Rowell] would have made different considerations" (Hrg. Tr. at 27:16–19).

To establish ineffective assistance of counsel violating the Sixth Amendment, a defendant must demonstrate both "(1) that counsel's performance was so unreasonable under prevailing professional norms that 'counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment,' and (2) that counsel's ineffectiveness

---

[7] Ineffective assistance of counsel is ordinarily addressed in collateral attacks on convictions because "the constitutional sufficiency of counsel's performance is usually unripe for seasoned retrospection until after the trial and whatever appeal may follow." *United States v. Davis*, 239 F.3d 283, 285 (2d Cir. 2001) (quoting *United States v. Salameh*, 152 F.3d 88, 160 (2d Cir. 1998), *cert. denied sub nom. Aboulhalima v. United States*, 525 U.S. 1112 (1999)).

prejudiced the defendant such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Gaskin*, 364 F.3d 438, 468 (2d Cir. 2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 694(1984)). "In applying this standard, a reviewing court must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that under the circumstances, the challenged action 'might be considered sound [legal] strategy.'" *Id.* (quoting *Strickland*, 466 U.S. at 689).

First, Rowell maintains that Marquette provided ineffective assistance by failing to move to strike Juror # 38, despite that juror's comment that "[if] I was the defendant I don't think I would want me on the case. . . . Maybe because I still hold some preconceived notions about police officers' testimony." However, as discussed above, Juror # 38 stated clearly that he would fairly assess all evidence despite his prior occupation as a police officer. Rowell has therefore failed to meet his burden of establishing that Juror # 38's inclusion on the jury without objection was unreasonable and that Marquette's decision not to challenge or strike was therefore ineffective.

Next, Rowell claims that Marquette provided ineffective assistance by not impeaching Marchetti's statement to the Grand Jury that Watts had no pending cases as of October 2009. "Decisions whether to engage in cross–examination, and if so to what extent and in what manner, are . . . strategic in nature." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). Such strategic decisions presumptively fall within "the wide range of acceptable professional assistance." *See Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002); *see also, e.g.*, *Mathurin v. United States*, Nos. 01cv1374(LAP), S1 96cr129(LAP), 2007 WL

2589450, * 12 (S.D.N.Y. Sept. 5, 2007) ("It is well established that the decision to engage in cross–examination and if so, to what extent and in what manner, are tactical decisions that should not be second–guessed by the courts."). Although Marquette did not impeach Marchetti during cross–examination on this point, he used his cross–examination of Marchetti to emphasize that both Geyer and Watts frequently acted as Government informants in exchange for financial compensation. As noted above, Marquette also questioned Watts about his pending cases. Marquette's strategic decision to focus on undermining the credibility of the cooperating witnesses themselves and tactical decision not to impeach Marchetti are decisions of legal strategy falling within the range of reasonable legal assistance, which the Court will not second guess.

Rowell also claims that Marquette's letter mislabeling as DEA, not ATF, federal agents at a reverse–proffer session, demonstrates ineffective assistance. He has not explained how he was prejudiced in any way by this error.

Additionally, Rowell argues that he requested that Marquette waive his speedy–trial rights, and when Marquette failed to do so, Rowell wrote a letter on January 14, 2010 to the Court to waive such rights. However, after Rowell's demand, Marquette did so on February 20, 2010, and it is not apparent how Rowell was prejudiced by Marquette not doing so earlier. Rowell also faults Marquette for his reluctance to move to for DNA testing, which Marquette explained as delayed by Defendant's refusal to execute an affidavit in support, although he did ultimately so move without the affidavit. Since the Court has considered this motion and found it without merit, Rowell has failed to demonstrate how he was prejudiced by Marquette's delay.

Finally, Rowell claims he did not see the whole video taken by Geyer and Watts, introduced by the Government at trial, until two days before trial, and he now says that he may have made "different considerations" had he seen it earlier such that "maybe we wouldn't be standing here today." (Hrg. Tr. at 27:16–21.) Rowell does not specify what he means by "different considerations." His suggestion that he would have considered entering a guilty plea is insufficient. To claim that "counsel's ineffective assistance led to the rejection of a plea offer that, properly informed, would have been accepted, a [defendant] . . . must proffer arguably credible evidence of a *prima facie* case that, but for counsel's improper advice, the [defendant] would have accepted the plea offer," which "may be accomplished through the [defendant's] own sworn statement if it is credible in light of all the relevant circumstances." *Puglisi v. United States*, 586 F.3d 209, 215 (2d Cir. 2009) (citing *Aeid v. Bennett*, 296 F.3d 58, 63–64 (2d Cir. 2002)). Rowell has offered no sworn statement that he would have entered a guilty plea but for Marquette's delayed actions. To the extent that Rowell argues that the "different considerations" might have included asserting an entrapment defense (*see* Hrg. Tr. at 27:22–28:5), there seems to be no difference between seeing the whole video further in advance of trial compared to seeing excerpts of the video, which made it clear that Watts and Geyer were cooperating Government informants, for whom they recorded the controlled drug purchase from Rowell and his crack preparation for them.

Considering Rowell's grounds as a whole, the Court concludes that he has failed to demonstrate that Marquette provided ineffective assistance of counsel because Rowell has established neither ineffective assistance of counsel nor a total breakdown in

communications, and his motion to relieve and substitute Marquette as his counsel is denied.

V.  Conclusion

For the foregoing reasons, Defendant's Motion for Acquittal [Doc.# 104], Motion for a New Trial [Doc.# 105], Motions for DNA Testing [Doc. ## 95, 115], Motion for funds for DNA testing [Doc. # 114], and Motion to Relieve Counsel [Doc. # 113] are DENIED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 7th day of September, 2010.